Good morning, Your Honors. I'm going to try to be as brief as I can. I represent Leilani Lake. She has fibromyalgia. This Court has already decided Treviso and Ravels, which fibromyalgia, which was discovered when she had a spur in her back. And when she, her employment kind of disintegrated. So she had three specialists who... Counsel, did she quit her job because she met someone on online dating? No. She suffered depression. And it is a dramatic situation where she seemed to go off the deep end and play video games all night. Her employer started giving her very bad reviews. And so she decided to leave Alaska and go to Washington. Hopefully that this person that she met online and her new little, the temperatures would be a little less. She worked for several years as the bookkeeper after her fibromyalgia was diagnosed, correct? Right. And fibromyalgia is progressive. It's what we used to call rheumatism, muscular rheumatism. And it was just renamed. So she did try to keep working. But when she got, she started getting what she considers brain fog, inability to concentrate. She was an account manager. But the ALJ determined that she had sufficient RFC to work as a bookkeeper, correct? Well, she did, but there wasn't any facts for that because the employer gave her bad reviews. And she, you know, she had never gotten any bad reviews before. It was one of those situations where she tried to get different work. In Alaska, you can ask for work and apply for unemployment that has accommodations. So they have that in there. But the ALJ found that she was not disabled, correct? Well, the ALJ has to... And I mean, that's what his finding was. And we need to affirm if substantial evidence supports that, correct? Right. And the ALJ has to follow that five sequential process. So once they find that there's, you know, that it doesn't mean an adult listing, they have to go on and say what the impairment is and whether that impairment limits the capacity to work. So the ALJ said, really was doing, was saying that she's not credible. And that's what he had to do, that she left her job. She wasn't, and I, that isn't really an issue as part of the Social Security rulings or the federal rulings. Did you challenge the ALJ's step four finding that she was not disabled? We challenged the fact that the ALJ's decision did not review her specialists and that the ALJ did not deal with the in contradiction to Revels, in contradiction to Teresio, which are both cases where if you have a specialist and they say there are limitations, she has trouble, for instance, walking. She has a toxic walking. She has pain in 18 parts of her body. There was expert testimony that there were more than 100,000 jobs in the economy, which she could perform, correct? That is a vocational expert's opinion, and that is an opinion not that ALJ asks, are there jobs that she could work? But he has to, before that, deal at step four with whether the limitations from the disability, he has to tell the vocational expert, given this, could they work this job? And I know that you think he got it wrong, but he did make that determination, correct? Well, okay, so the ALJ's position is not to make a, he has to have evidence to support anything he does. So the support has to be, can that medical determination, he gave it straight out that she had fibromyalgia. There's no argument that she didn't, or that, and in the ruling, the ruling states that the experts are the ones that, it has to be a specialist, it has to be a rheumatologist, and she has three who talk about her limitations. The ALJ has to address that in the ruling, in his finding, and he didn't, didn't talk about it at all. There's no discussion about her rheumatologists. Now, there's no, she also has those have to be discussed. So you can't, an ALJ cannot just say, oh, what kind of jobs can you, are available for her? He has to, that's the fifth step. So the fourth step is, what's the capacity, given those impairments? And then that would be a proper, you know, step five. I think I got the ALJ's gender wrong, but she talked about in her findings the records of at least a dozen physicians, correct? I'm glad you brought that up. She doesn't bring up any treating physicians that are specialists in rheumatologists. She relies on the non-treating examiners. So the ruling 12-2P for fibromyalgia, Social Security's ruling, states that you have to see the person to even discuss fibromyalgia, and specialists have to make that conclusion. And all, you know, what we're saying is that needed to be addressed, and it wasn't. You can't just jump in and say, oh, you can, I guess, but it wouldn't be legal, to jump in and say, well, they have fibromyalgia, and the specialist said it, but we're not going to talk about that. She could work any job that we think. I mean, it has to be a logical conclusion. Given these impairments, she could work these jobs. But that's missing from this. This whole case has like a big hole. There's no addressing the like little cases, oh, I went to the doctor and my hand was normal. It has to be an overall arc, and it's not an adversarial hearing. It's supposed to be, we're supposed to find the facts, and this court's been very clear. So this case kind of falls under the umbrella of Treviso and Rafel's. Can I ask you to address the ALJ's adverse credibility finding? She gave a number of reasons for that finding. The commissioner is not defending all of them, but that still leaves several other reasons, some of which you have not challenged on appeal. So my question is, the initial question is, as long as there are some valid reasons, doesn't that mean that the decision is up with Rule 16.3 that expanded the fact that we're not going to go after the claimant and say, well, you said this here, and you said that here, so it's not like a criminal proceeding, so you're not credible. We're going to look at the whole situation. And these particular issues are not really valid, because you can apply for unemployment. There were unemployment. She could drive. She played video games, and she went to church. She said she went to church, and then she said she didn't go to church. Wasn't one of the commissioners, I mean, wasn't one of the ALJ's key findings that the claimant's testimony was clearly contradicted by the medical evidence? No, the ALJ said that, but because she applied for unemployment, which is okay in Alaska. If you have a disability, you can apply. And you can say, you know, with accommodations. She went to church. Now, she could go to church when she applied and not be able to get to church at the hearing, and I don't know if that's evidence of anything. You can drive. She doesn't drive, but she has a driver's license, and she does have manic episodes where she stayed up all night, played video. She left, you know, online dating, left her relationship. She has mental issues, which also haven't been addressed at the ASC, so I would like to reserve five minutes to respond. You have a minute left. Okay. So let's see what the commission has to say. Good morning, Your Honors. Elizabeth Feer for Andrew Thal, the Commissioner of Social Security. The ALJ, in this case, there's no question that this claimant has fibromyalgia, and the ALJ explained that. She understood that every doctor who treated this claimant, and there were many or saw her, understood that she had fibromyalgia. However, no treating sources issued any limitations, so my opponent is just dead wrong about that. There are no opinions of limitations from the treating sources. In fact, early on, all the rheumatologists, Dr. Salmon told her to increase her physical activity or start doing yoga. Dr. Reddy also encouraged the claimant to exercise, as did Dr. Wemple. Those are not limitations. Those are not consistent with any sort of work limitation. And if you look at her progressive record, which is what SSR 12-2P tells an ALJ to do, I just want to clarify a little thing here. You need a specialist to diagnose fibromyalgia per that SSR. You don't need a specialist to specifically address limitations. And we're past that first step. We know this is a medically determinable impairment, and we know it's severe. So then what the ALJ does is look at the claimant's longitudinal treatment history, which becomes the most important factor here, since fibromyalgia is not amenable to objective documentation. So if you compare the early treatment records here that slightly predate her March 2012 alleged onset date, and then you compare the ones that are at the very end of the record in November 2014 is the last one, her symptoms are actually better at the later part of the record than they are in the first. When she goes to see the Doctors Express doctors down in San Diego between April and August of 2014, she's specifically denying fatigue, and she's specifically denying any psychiatric limitations. And then you have the last record, which is from Evergreen in Seattle, and that is November 2014, and that one specifically says that based on a detailed medical examination, her findings are completely unremarkable. So if someone has fibromyalgia that is severely limiting, somewhere in the course of that longitudinal treatment, some doctor is going to say something about limitations. There's nothing in the record from an expert or a treating physician that says that as a result of her fibromyalgia, she is so disabled she can't work. That is absolutely correct. And so the doctors who did assess her functionality, one of them was Dr. Hamilton, the consultative examiner, and he agreed she has fibromyalgia. He even agreed that she had some pain resulting from that. He said there's no limitation in her standing or sitting, and she could carry between 35 and 50 pounds. Yes, which is consistent with the RFC. And then subsequent to that, you have one state agency expert, Dr. Hale, who looked at that record and also found that the claimant was capable of medium work. And on the psychiatric side, you have even less evidence. Claimant, if you look at her testimony, which is the last chance she has to explain what's wrong with her, when the ALJ asks what her psychiatric limitations are, she says, I have thoughts that I shouldn't have, and then she's moody. And that's at pages 49 and 50 in the record. There's nothing about a limitation in that statement. So then you have Dr. Griffin, who's the psychiatric CE, whose report is a little odd, I will admit that. She goes through the medical examination, and she doesn't really find anything significant. And then at the end, she says claimant is capable of, nothing will prevent her from simple tasks, and she should be able to return to work within six months or 12 months with treatment. But if you look at her report, she's very concerned with claimant's alcohol use. So there's an element of that which could go to Dr. Griffin's findings. But after that, you have two state agency experts who look at the whole record, including that report, Dr. Koval and Dr. Donahue. And they both, although they say the claimant's psychiatric limitations are slightly more than mild, they still have a functional capacity that says she's capable of simple and complex tasks, and that there's nothing that would interfere with her ability to perform a full week. So we simply don't have evidence of ALJ error here. She found, properly assessed the functional capacity based on the doctors who did assess limitations. And she properly found the claimant's subjective allegations, which are important to fibromyalgia, were not fully supported by the record. And to get to your point, Judge Miller, two of the things that claimant didn't challenge were the fact that the objective evidence didn't support it. And you can get around the fibromyalgia no subjective or no objective elements to it by noting that even with this diagnosis throughout the record, no doctor ever assessed limitations based on it. And then the fact that she stopped working for reasons that had nothing to do with fibromyalgia. And she's got this very consistent history. She was capable of working with it. And as the ALJ said twice, nothing changed in this record. So we ask that you uphold the ALJ's decision, as did both of the adjudicators in the district court. All right. Thank you, counsel. I'll give you another minute, counsel. I'll be as quick as I can. I'm sorry to say, but my colleague, that's not true. Her specialists state that she has difficulty with incontinence, depression, and she has these are specialists, rheumatologists, fibromyalgia, and it's Sorry. Which doctor? Dr. Wempel on page 342 says that her whole, she has skin burning, stinging for the last few weeks. She hasn't changed sheets, soaps. She's got rashes. She's positive for whole body pain. And the whole point of the fibromyalgia listing is that you can't meet that listing unless you have the symptoms that cause that. It's not that you get to say, oh, you have fibromyalgia. A specialist has to go through the rule. And the whole point, the definition of fibromyalgia is widespread pain. And it does come and go. And what the commissioner is saying is that she's referring to doctors who never saw. The initial people who saw the initial documents that were in at the start of the record, no one who saw her, those who saw her determined that she has widespread pain. She's got depression. And as far as mental illness goes, you can meet the adult listing just on mental illness, which she doesn't. But you still have to address whether that's going to affect her on the job. This whole case is about whether the fibromyalgia would affect the job. And that whole evaluation is missing. So we're saying that there's not substantial evidence. The ALJ cannot just pick people who didn't see her or pick, you know, cherry pick, as they say, through the record. It has to be proper. It has to be uniform. It has to be regular. There has to be evidence. And not discussing the treating physicians, there could be subpoenas. There could be she could have sent her out to someone who saw her. But there's no evidence that supports this ALJ's decision. All right. Thank you, counsel. Lake versus Saul is submitted.
judges: Wardlaw, Bennett, Miller